IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **ADAMS OFFSHORE, LTD.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) CIVIL ACTION 09-0378-WS-B |
| | ) |
| **CON-DIVE, LLC, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

This matter is before the Court on the motion of the plaintiff Adams Offshore, Ltd. ("Adams") to recover custodia legis costs from claimants Blake Marine Group ("Blake") and Cashman Equipment Corporation ("Cashman"). (Doc. 251). The parties have submitted briefs and evidentiary materials, (Docs. 251, 257, 270, 293-95, 301-02, 305), the Court conducted a hearing to receive additional evidence, and the matter is ripe for resolution.

**BACKGROUND**

The subject property ("the Equipment"), a highly specialized diving system owned by defendant Oceanagrafia S.A. C.V. ("OSA") and worth millions, was aboard a vessel owned by intervenor McDermott Gulf Operating Company ("McDermott") and chartered by defendant Con-Dive, LLC ("Con-Dive"). As recounted more fully elsewhere,[1] McDermott terminated the charter party for non-payment as the vessel lay in Mexican waters. When McDermott refused to surrender the Equipment to OSA, OSA filed a criminal complaint, which triggered a government investigation. A Mexican district

---

[1] *McDermott Gulf Operating Co. v. Con-Dive, LLC*, 2009 WL 1537871 (S.D. Ala. 2009).

attorney boarded the vessel and ordered McDermott to transfer the Equipment to another vessel pending investigation. McDermott not only refused to comply with this lawful order but affirmatively prevented removal from being accomplished. McDermott did not challenge the order administratively or judicially but simply ignored it and sailed the vessel to Mobile in order to arrest and attach the Equipment here. On OSA's motion to vacate, the Court found these facts and ruled that they furnished grounds for an equitable vacatur of the attachment. *Id*. at *3-6.[2] The Eleventh Circuit affirmed, holding that the Court had power to vacate attachment on equitable grounds and did not abuse its discretion in doing so. *McDermott Gulf Operating Co. v. Con-Dive, LLC*, 371 Fed. Appx. 67 (11th Cir. 2010).

The Court's order vacating arrest and attachment was entered on May 29, 2009. Adams filed this action on June 25, 2009 and sought attachment of the Equipment. The Equipment was still in the district because McDermott's motion to stay the Court's vacatur order pending appeal was under consideration and the vacatur order was temporarily stayed pending resolution of the motion to stay. The Court issued Adams' requested order of maritime attachment on Friday, June 26 and its order denying McDermott's motion for stay pending appeal on Monday, June 29. The Marshal perfected the attachment on June 30. Blake filed its complaint in intervention, including Rule B attachment, on July 14, and Cashman followed suit on July 15.

OSA eventually moved for vacatur of the attachment, which the Court granted. In short, the Court ruled that the conduct of Adams, Blake and Cashman in attaching the Equipment was an inequitable attempt to claim for themselves the benefit of McDermott's inequitable conduct, of which they were fully aware when they attached the Equipment. (Doc. 229). Because the Equipment was released and never sold, there is no

---

[2] The Court vacated the arrest of the Equipment because McDermott had no maritime lien. *Id*. at *6-7.

fund out of which the custodia legis fees may be paid, precipitating this fight over allocation.

The Equipment was offloaded from McDermott's vessel between July 29 and August 1, 2010. McDermott filed a motion and amended motion seeking recovery of its alleged custodia legis costs incurred between Adams' June 30 attachment and the August 1 completion of offloading, on the theory that it effectively served as an involuntary custodian during this period, since the attachment precluded its vessel from leaving port until the Equipment was offloaded. (Docs. 79, 114). The Court recently entered an agreed order dismissing McDermott's custodia legis claims against Adams, Blake and Cashman and also dismissing Adams' claim, contained in the pending motion, for custodia legis fees as against McDermott. (Doc. 290). Except for McDermott's claim against Blake, all of the dismissed claims were resolved by settlement; McDermott's claim against Blake was dismissed pursuant to Rule 41. (Doc. 289 at 1-2). This resolution leaves for consideration only Adams' claim against Blake and Cashman for custodia legis fees.

Adams initially claimed in excess of $329,000 in custodia legis fees. (Doc. 251 at 1). Before the hearing, Adams lowered its demand to $300,132.96. (Doc. 293 at 3). Following the hearing, Adams dropped its claim again, to $281,761.11. (Doc. 301 at 2, 10). Only the latter figure remains at issue.

## DISCUSSION

The local rules provide that "[i]ntervenors under this rule shall be liable for costs together with the party originally effecting seizure *on any reasonable basis determined by the court*. Intervenors may be required by the Marshal to advance their share of reasonable accrued costs and reasonable unaccrued advance costs, *giving due deference to the respective amounts of the various claims*. Relief from such assessment may be granted by the court upon motion." LAR 6(c) (emphasis added). The parties agree that the Court has wide discretion to impose any reasonable allocation of custodia legis fees

as among Adams, Blake and Cashman. (Doc. 251 at 5; Doc. 257 at 1; Doc. 294 at 5; Doc. 295 at 7).

## I. Allocation Method and Adjustments.

The local rule, quoted above, indicates that the relative size of the parties' claims should be considered in assigning responsibility for costs. According to Blake, the model local admiralty rules affirmatively require an allocation on this basis. (Doc. 295 at 8). *See also Beauregard, Inc. v. Sword Services L.L.C.*, 107 F.3d 351, 353 n.8 (5th Cir. 1997) ("[A]n intervenor with a very small claim might not be forced to bear the same proportion of the cost of maintenance as a claimant with a large claim. In such circumstance, costs might be divided according to the relative size of each party's claim."). A number of cases cited by the parties have allocated on this basis. *E.g., Dedolph v. Pacatlantic Fisheries, Inc.*, 2000 WL 33302239 at *3 (W.D. Wash. 2000); *Hvide Marine, Inc. v. M/V Pacific Mako*, 1998 WL 1108952 at *2 (S.D. Ga. 1998).

The size of the parties' claims, as reflected in their demands, is as follows:

| | |
|---|---|
| Adams | $7,000,000 |
| Blake | $60,647,834 |
| Cashman | $1,700,000 |

(Doc. 1 at 6; Doc. 20 at 4, 5, 6; Doc. 23 at 6). Utilizing the relative size of claims as favored by these authorities and others cited by the parties leaves Blake holding most of the bag. Understandably, Blake struggles to escape this measure.

In its post-hearing brief, Blake asserts that Adams should absorb all of its custodia legis costs because, as the first to attach, its claim had priority over those of Blake and Cashman. (Doc. 302 at 2-3). In the arrest context, the Eleventh Circuit has made clear that "all claimants share in the administrative expenses," *Donald D. Forsht Associates, Inc. v. Transamerica ICS, Inc.*, 821 F.2d 1556, 1561-62 (11th Cir. 1987), which would preclude a 100% allocation to Adams. Blake, however, argues that attachment differs from arrest because all lienors of equal rank share pro rata, while the first attaching party,

given its priority over later attaching parties, benefits disproportionately or – depending on the size of its successful claim compared to the value of the vessel – exclusively. Blake's argument is interesting, but it comes too late, as the briefing on all issues other than the reasonableness of Adams' claimed expenses was closed at the hearing. Blake offers no reason it could not have timely raised this argument in either of its pre-hearing briefs, and the Court will not consider it now. The Court thus turns to Blake's timely arguments.[3]

First, Blake asserts that the local rule actually "contemplate[s] equal allocation." (Doc. 295 at 7). Blake does not explain how it derives this proposition, which is plainly contradicted by the rule's text. Moreover, the model local rules which Blake offers as an alternative themselves "require sharing of custodial expenses for intervention in proportion that the intervenor's claim bears to the sum of all the claims." (*Id*. at 8 (internal quotes omitted)).[4]

Second, Blake proposes that the allocation be based, not on the full amount claimed, but only on "hard damages." (Doc. 295 at 7-8). According to Blake, its "hard" damages are limited to $950,000 (consisting of a forfeited down payment on the purchase of a derrick barge and crane), perhaps amplified by other expenses totaling $371,629. (*Id*. at 7, 8-9). Over $58 million of Blake's claim, which it now deems "soft," is for

---

[3] Blake should not assume its argument would have carried the day had it been timely asserted. As in the arrest context, "the possibility of recovery served as a sufficient incentive to cause each claimant to … intervene in the action …. Pursuit of this possibility necessarily carries with it an attendant responsibility to preserve the property, for without a preservation of the property no recovery is even possible." *Forscht*, 821 F.2d at 1562 n.8. Blake pursued the possibility of recovery and thereby incurred an attendant responsibility to preserve the Equipment.

[4] This case presents a prime example of the grossly disparate claims which the Fifth Circuit in *Beauregard* contemplated as appropriate for non-equal allocation. Blake's claim represents 87.5% of the total – or 35 times Cashman's claim – yet Blake insists it should not pay a penny more than Cashman.

unpaid net charter hire due to OSA's breach of a maritime contract, which called for hire at the rate of $40,000 a day for 60 months. (Doc. 20 at 2-3).

Notably, Blake offers no authority for the proposition that only "hard" damages count, contenting itself to suggest obscurely that the Court "should look behind the bare allegations of the complaint, much the same as the analysis in [sic] amount in controversy for removal and remand." (Doc. 295 at 8). The Court rejects this argument as unsupported by authority or even an explanation why the removal rule should be imported to the custodia legis context.

Nor would the removal scenario Blake proposes advance its position. When a state complaint includes a specific dollar demand, that demand controls for removal purposes unless the plaintiff establishes to a "legal certainty" that he cannot recover the amount claimed (if over $75,000) or the defendant establishes to a legal certainty that the plaintiff, if successful, must recover more than the amount claimed (if under $75,000).[5] By Blake's own argument, then, its $60 million-plus demand would control for allocation purposes unless Blake showed to a legal certainty that it could not recover this amount. Blake poormouths its claim, saying it is not "likely" to recover $60 million, (Doc. 257 at 3), but it does not come close to showing to a legal certainty that it could not recover its demand.

Unable to reduce its own claim, Blake turns to increasing the size of Adams' claim. Most of its arguments, however, as well as those of Cashman, center on McDermott, not on Adams. They reason as follows: (1) McDermott cannot be required to contribute to Adams' custodia legis fees because it is no longer a party to the lawsuit; (2) McDermott is no longer a party because Adams and McDermott settled their claims against each other; (3) Adams benefited from the dismissal, since it resolved

---

[5] *Mitchell v. Brown & Williamson Tobacco Co.*, 294 F.3d 1309, 1315 (11th Cir. 2002) (demand above $75,000); *Burns v. Windsor Insurance Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994) (demand below $75,000).

McDermott's claim against Adams; (4) but Adams did not obtain reimbursement from McDermott for any of Adams' custodia legis expenses; and (5) Adams should therefore be tabbed with the allocation that would have fallen to McDermott had it remained a party. (Doc. 294 at 5; Doc. 295 at 3-4). While there may be other weaknesses in this argument, the dispositive one is that McDermott, had it remained a party, would not be subject to any allocation of Adams' custodia legis expenses. Thus, Adams' allocation will not be increased to account for McDermott's non-existent allocation.

Blake and Cashman first argue that Adams' claim should include the value of McDermott's claim. Even if successful, this argument would do little to dilute the shares of Blake and Cashman, since McDermott's claim in intervention was only $1,024,000.[6] But the argument cannot succeed, because McDermott does not stand in the same position as the remaining parties. McDermott did intervene, but not to press a claim against the Equipment or its owner. Instead, McDermott asserted a claim only against Adams, Blake and Cashman, for its costs as involuntary custodian of the Equipment.[7] McDermott did not seek sale of the Equipment but only a designation of its claim as custodia legis so as to be taxed against the proceeds of any sale engineered by the attaching parties, just as any unpaid provider of custodial services might do. Under Blake's and Cashman's view, any such provider, by the act of intervening in order to be paid its due, would have its legitimate bill for services effectively written down merely because it had the audacity to seek payment from unwilling creditors. Blake and Cashman have advanced no discernible justification for such a result, which the Court declines to accept.

---

[6] (Doc. 114 at 6-7). Adams and Blake describe McDermott's claim as just over $1,286,000, (Doc. 293 at 2; Doc. 295 at 10), but they have improperly added together two explicitly alternative demands for relief. (Doc. 114 at 5-7).

[7] Adams' initial assertion that "McDermott joined in the attachment of the [Equipment]," (Doc. 251 at 4), is incorrect, as Adams appears to concede. (Doc. 270 at 1).

Blake and Cashman next propose the remarkable solution that Adams be tabbed with most or all of the custodia legis expenses because, but for McDermott's inequitable conduct in bringing the Equipment to Mobile, they would not have been tempted to engage in their own inequitable conduct by bootstrapping on McDermott's. (Doc. 294 at 4; Doc. 295 at 4, 7).[8] The suggestion is unaccompanied by any citation to authority and by no argument save a general invocation of "equity." McDermott's conduct was indeed inequitable, as the Court has previously determined, but that conduct did not cause Adams, Blake or Cashman to attach the Equipment. These parties were not tricked by McDermott into innocently attaching the Equipment. Rather, as the Court ruled in vacating their attachments, they made their own independent decisions to attach the Equipment with full knowledge that McDermott had inequitably brought it into the District. McDermott's prior and independent inequitable conduct furnishes no grounds to relieve Blake and Cashman, in whole or in part, of the consequences of their own inequitable conduct.

In a related vein, Blake argues that McDermott (and hence Adams) should be tabbed with the entire cost of removing the Equipment from the vessel because the removal benefited McDermott. The idea is that McDermott desired that the Equipment be removed, both because the charter party had ended and because McDermott could not, after attaching and arresting the Equipment, sail its vessel without offloading it. Blake concludes that the parties herein saved McDermott the expense of removing the Equipment itself, resulting in an unjust windfall to McDermott. (Doc. 257 at 4; Doc. 295 at 3).

As to offloading incident to arrest and attachment, once the Court denied McDermott a stay of its vacatur order pending appeal on June 29, McDermott had no interest in offloading the Equipment based on its vacated arrest and attachment. As to the

---

[8] To be fair, this was also Adams' position prior to its settlement with McDermott. (Doc. 251 at 5-6).

charter party, Blake relies on two provisions which plainly do not impose any duty on McDermott, as opposed to Con-Dive, to offload the Equipment. (Doc. 51, Exhibit A at 4). Nor has Blake explained why McDermott or OSA – a Mexican concern working primarily on Pemex contracts and with no Mobile connection – would desire the Equipment to be offloaded in Mobile rather than sailed elsewhere. Blake has shown no benefit to McDermott from the Equipment's offloading and no unjust windfall to be undone by an allocation of custodia legis expenses to McDermott.

Blake also complains that McDermott delayed the offloading by refusing access to the Equipment and by requiring a Rule 34 motion to inspect. (Doc. 295 at 6). The file reflects that Blake did not request an inspection of the Equipment until July 15 and that McDermott agreed on July 23. (Doc. 29 at 2; Doc. 50 at 1). Blake does not explain how this constitutes unreasonable delay; neither does it identify or quantify the harm, if any, from this brief interval. No allocation of expenses to McDermott is justified by this circumstance.

Blake urges that McDermott caused further delay because, the Equipment having arrived improperly, Customs issues complicated the offloading. (Doc. 295 at 6, 9). While McDermott's inequitable conduct resulted in the Equipment being in the District without legal permission to land, as noted above McDermott's conduct did not cause or force the remaining parties to attach the Equipment. Having elected to do so despite knowing of the Court's judicial finding of inequity, they took the Equipment as they found it, including its Customs difficulties.

Finally, Blake argues that Adams "excluded" Blake from decisions concerning removal and thereby delayed the process and prevented Blake from securing better prices than Adams obtained. (Doc. 295 at 2, 6, 9). Blake has not shown that Adams' conduct delayed offloading or that Blake was harmed thereby. As discussed in Part II, Blake has not shown that its involvement would have resulted in lower costs.

The Court concludes that the appropriate allocation of Adams' custodia legis expenses is in proportion to the size of the claimants' claims. Thus, Blake is assigned responsibility for 87.5% of those expenses, Adams 10%, and Cashman 2.5%.

## II. Amount of Approved Custodia Legis Expenses.

The parties agree that only expenses necessarily or reasonably incurred and reasonable in amount may be recovered as custodia legis expenses and that Adams bears the burden of proof. As noted, Adams claims $281,761.11. Cashman affirmatively agrees with the reasonableness and necessity of most components of this figure. Blake challenges each component, suggesting no recovery at all and, in the alternative, a reduced sum of $65,281.02. (Doc. 302 at 9-10).

The claimed expenses may be summarized as follows:

| | |
|---|---|
| Marshal's fees | $30,301.15 |
| Survey | 1,037.50 |
| Shifting vessel to new custodian's facility | 10,922.14 |
| Dockage at new facility pending offloading | 20,104.00 |
| Obtaining Customs authorization to unload | 14,538.07 |
| Physical removal of Equipment | 38,061.29 |
| Oversight of removal process | 77,964.41 |
| Storage and custodial fees | 59,230.53 |
| Insurance | <u>29,602.00</u> |
| TOTAL | $281,761.11 |

Shifting the vessel and dealing with Customs was accomplished through Central Dispatch ("Central"). Dockage, the physical removal of the Equipment, and post-removal storage and custodial services were provided by Core Industries ("Core"). Oversight was by Malin International Ship Repair & Drydock ("Malin").

The vessel was berthed at Atlantic Marine. Atlantic Marine bid approximately $110,000 just to remove the Equipment from the vessel. Atlantic Marine advised that an

expert in diving systems, such as Malin, would also be required. Moreover, since Atlantic Marine had no storage facility, the Equipment would have to be transported overland after removal, risking damage to it. The charges of Central and Core for shifting the vessel, dockage and physical removal was approximately $69,000 and so obviously a better deal for the same result, with less risk.

The charges of Core and Central were at or below their standard. Blake's representative testified that he could have obtained these same services from these same providers for 10 to 20 per cent less, which Core's representative denied. The Court finds the testimony of Blake's representative speculative and does not credit it. Nor has Blake shown that any cost over the lowest possible cost must be deemed unreasonable. These charges were necessarily incurred and reasonable in amount.

The Equipment is a large, complex and expensive diving system and, as Atlantic Marine also recognized, its removal could not be properly undertaken without assistance from one with expertise in such systems. Malin has such expertise and in fact oversaw the loading of the Equipment on the vessel at the commencement of the charter party. Blake does not deny that Malin's services were appropriately utilized. Malin lost money on the job. To the extent Blake's representative claims he could have gotten Malin to do the work at an even greater loss, the Court rejects his testimony as speculative and lacking credibility. These charges were necessarily incurred and reasonable in amount.

The survey was needed in order to assess the technical difficulties of removal, and dealing with Customs was required because the Equipment had not been cleared for import. The Court finds the amount of these expenses to be reasonable, rejecting Blake's tepid argument to the contrary.

It was obviously necessary for the Equipment to be stored, and Blake does not suggest otherwise. Core provided 10,000 square feet of storage, half of it inside with de-humidifier and all of it with power, for $3,000 a month – a blended rate of $0.30 per square foot, a small fraction of Core's standard rate. To the extent Blake speculates it

[11]

could have negotiated a better rate, the Court again rejects the proposition and finds the actual charge to be reasonable.

On August 26, 2009, Adams procured insurance on the Equipment for a yearly premium of $27,725. Adams renewed the policy approximately one month before the Court vacated the attachments in September 2010, for which period Adams seeks an additional $1,877. Adams' representative conceded the insurance expense was "to some extent superfluous," since the Equipment was stored at Core and Core maintained insurance. Adams argues the expense is nevertheless a proper custodia legis charge because it "had no way of ensuring that Core's insurance premiums where [sic] paid or that Core's policies otherwise stayed in place." (Doc. 301 at 7). The Court is not persuaded that a charge of almost $30,000 was a reasonable response to the merely theoretical possibility that Core would not maintain its insurance. The Court rejects the insurance charge in its entirety as unreasonably incurred.

Adams claims Marshal's expenses of over $30,000, which it says covers three months. Adams provided no documentation of this expense. The Court rejects Blake's suggestion that it exclude the Marshal's expense in its entirety for failure to produce documents showing the expense was incurred. The Court accepts as credible the testimony of Adams' representative that the Marshal charged this amount for its services and that Adams paid this amount in full. However, the claimed amount is subject to substantial revision downward.

Adams states that the Marshal provided the "same services" that Core ultimately provided, i.e., "storage and custodial services," but at twice the cost. (Doc. 301 at 4). A reasonable plaintiff, therefore, would have transferred the Marshal's services to Core at the earliest possible opportunity. Adams reached agreement with Core to store the Equipment in late July, but it did not move to have Core appointed as substitute custodian until mid-September. (Doc. 73). In the absence of explanation for this delay, which Adams does not provide, the Court finds the delay unreasonable. The first four weeks of the Marshal's charges is reasonable in amount, because Core was not yet involved. After

that, Core was providing storage services, so Adams cannot recover for the redundant storage services provided by the Marshal. Similarly, after four weeks Core should have been providing substitute custodial services, and Adams can for this period recover only the $500 per week that Core charged.

The Marshal's charges work out to $2,525 per week. The first four weeks of these charges, or $10,100, are reasonable. For the remaining eight weeks of the Marshal's involvement, only $500 a week is reasonable. The portion of the Marshal's charges that can be charged as reasonable custodia legis expenses is thus $14,100.

The total of the claimed expenses that are properly chargeable as reasonable custodia legis expenses is fixed at $235,957.96. Adams will absorb 10% of this amount. Blake will reimburse Adams 87.5% of this amount, and Cashman will reimburse Adams 2.5% of this amount.

## CONCLUSION

For the reasons set forth above, Adams' motion to recover custodia legis costs is **granted in part**. Blake is **ordered** to reimburse Adams the sum of $206,463.21. Cashman is **ordered** to reimburse Adams the sum of $5,898.95. To the extent Adams seeks additional or different relief, its motion is **denied**. No further order shall be forthcoming from the Court except upon application by any party for final judgment as prescribed by Federal Rule of Civil Procedure 58. The Clerk is directed to close the file.

DONE and ORDERED this 16th day of May, 2011.

                                            s/ WILLIAM H. STEELE
                                            CHIEF UNITED STATES DISTRICT JUDGE